**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2019 MAY 23  PM 3: 03

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
      DEPUTY

REAGAN NATIONAL ADVERTISING OF
AUSTIN, INC.,
                    **Plaintiff,**

                                            **CAUSE NO.:**
                                            **AU-17-CA-00717-SS**

–vs–

CITY OF CEDAR PARK,
                    **Defendant.**

---

### AMENDED ORDER[1]

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant City of Cedar Park (the City)'s Amended Motion for Summary Judgment [#24], Plaintiff Reagan National Advertising of Austin, Inc. (Reagan)'s Response [#29], Cedar Park's Reply [#30] in support, Reagan's Sur-Reply [#31] in opposition, and Cedar Park's Sur-Sur-Reply [#35] in support.[2] Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

This is a First Amendment case. Reagan is a commercial billboard company in the business of outdoor advertising. Am. Compl. [#18] at 2. On March 8, 2017, Reagan submitted five sign permit applications to the City. Am. Mot. Summ. J. [#24-2] (Sign Permit Applications). Three of these applications requested permission to install digital sign faces on existing outdoor

---

[1] The Court's original order contained a typographical error.

[2] Cedar Park's Motion to Strike Sur-Reply or, in the Alternative, Motion for Leave to File Sur-Sur-Reply [#32] is DISMISSED AS MOOT because Cedar Park has already filed its sur-sur-reply, which the Court considers herein.

signs (the Digital Conversion Applications). *Id.* at 1, 2–16. The other two applications sought permits for the construction of two new signs (the New Sign Applications). *Id.* at 1, 17–32.

To receive approval, permit applications must demonstrate proposed signs meet the requirements of the City's Sign Code.[3] These requirements are contained in two articles. The first article—Article 13.01—is entitled "On-Premises Sign Standards and Permits." Am. Mot. Summ. J. [#24-5] Ex. 5 (Sign Code) at 1. The second article—Article 13.03—is entitled "Off-Premises Sign Standards and Permits." *Id.* at 25.

Both Article 13.01 and Article 13.03 contain provisions which rely upon a distinction between on-premises and off-premises signs. An "on-premises sign" is defined as a "sign identifying or advertising the business, person, activity, goods, products, or services located on the site where the sign is installed, or that directs persons to a location on that site." Sign Code at 4. By contrast, an "off-premises sign" is defined as a "sign referring to goods, products or services provided at a location other than that which the sign occupies." *Id.* at 3–4. All five of Reagan's permit applications relate to off-premises signs.

On March 14, 2017, the City denied Reagan's permit applications. Am. Mot. Summ. J. [#24-4] Ex. 4 (Denial Letters). Among other reasons, the New Sign Applications were denied because they proposed using light-emitting diode (LED) displays in off-premises signs and because they proposed to erect "pylon signs." *Id.* at 7–10; *see also* Sign Code § 13.01.007(i)(4) ("Electronically controlled changeable messages signs shall not advertise goods or services not offered on the premises on which the sign is located."); *id.* § 13.03.006(d) ("No light emitting diode (LED) displays or signs shall be permitted."). The City also denied the Digital Conversion

---

[3] The City enacted a new sign code the day after Reagan submitted its permit applications. Am. Mot. Summ. J. [#24] at 5 n.4. However, Texas law requires the permit applications be evaluated under the law as it existed at the time they were submitted, rather than under the new, revised sign code. TEX. LOC. GOV'T CODE § 245.002.

Applications because, like the New Sign Applications, the Digital Conversion Applications proposed installing LED displays in off-premises signs. Denial Letters at 1–6; Sign Code §§ 13.01.007(i)(4), 13.03.006(d); *see also id.* §§ 13.01.016(a), 13.03.007(a) ("[N]o change or alteration shall be made [to existing signs] that would increase the degree of nonconformity [with the Sign Code].").

After the City denied Reagan's permit applications, Reagan filed this action in state court arguing that the Sign Code's differing treatment of on-premises and off-premises signs constitutes content discrimination and that this content-based distinction cannot survive constitutional scrutiny. Notice Removal [#1-1] Ex. 1 (Original Pet.) at 4. On this basis, Reagan seeks to invalidate the entire Sign Code. Reply [#31] at 3. The City removed the action to this Court and now moves for summary judgment. Notice Removal [#1]; Am. Mot. Summ. J. [#24]. This pending motion is ripe for review.

## Analysis

The Court first considers whether Reagan has standing to challenge the denial of its New Sign and Digital Conversion Applications. Because the Court concludes Reagan possesses standing to challenge the denial of its Digital Conversion Applications, the Court then turns to consider whether the City is entitled to summary judgment as to the constitutionality of the Sign Code provisions relied upon to deny those applications.

I.      **Standing**

A.      **Legal Standard**

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). In order to meet this case-or-controversy requirement, plaintiffs must establish they have standing to sue. *Raines v.*

*Byrd*, 521 U.S. 811, 818 (1997). Plaintiffs have standing to sue if they have suffered an injury in fact fairly traceable to the challenged action of the defendant and "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 750–52 (1984); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Def.'s of Wildlife*, 504 U.S. 555, 561 (1992).

### B.    Application

Reagan argues the City's denial of the New Sign and Digital Conversion Applications relied on Sign Code provisions that draw unconstitutional, content-based distinctions between on-premises and off-premises speech. The Court first considers whether Reagan possesses standing to challenge the denial of its New Sign Applications. It then considers whether Reagan possesses standing to challenge the denial of the Digital Conversion Applications.

#### 1.    New Sign Applications

The City suggests Reagan lacks standing to challenge the denial of its New Sign Applications because Reagan has not shown this denial is redressable. Am. Mot. Summ. J. [#24] at 5, 17; Reply [#30] at 1–2. In part, the New Sign Applications were denied because they sought to erect "pylon signs" prohibited by Sign Code § 13.01.006(e) (the "Pylon Provision"). Reply [#30] at 1–2. The City argues the Pylon Provision does not depend on the challenged distinction between on- and off-premises signs. *Id.* If, as the City suggests, the Pylon Provision does not depend on the challenged distinction, then Reagan's injury is not redressable because the Pylon Provision will provide a basis for denying the New Sign Applications regardless of how the Court rules in this case.

4

Reagan does not argue the New Sign Applications comply with the Pylon Provision. *See* Sur-Reply [#31] at 2–3. Instead, Reagan argues the City erred in relying on the Pylon Provision to deny the New Sign Applications because the Pylon Provision does not apply to off-premises signs. *Id.*[4] Reagan believes the Pylon Provision does not apply to off-premises signs because it is located in Article 13.01, which is entitled "On-Premises Sign Standards and Permits." *Id.* According to Reagan, this title conclusively demonstrates the provisions of Article 13.01 apply only to on-premises signs. Sur-Reply [#31] at 2–3.

In most circumstances, one would expect the title or heading of a statutory or regulatory provision to reflect the scope and purpose of that provision. But in some instances, a statutory or regulatory provision possesses a heading at odds with the provision's operative text. Perhaps for this reason, headings are just one of several considerations taken into account by Texas courts when interpreting statutory and regulatory provisions. *See* TEX. GOV. CODE § 311.023 (listing considerations that may be weighed by courts when interpreting statutory provisions);[5] *cf. Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[A] heading cannot substitute for the operative text of the statute[;] . . . [n]onetheless, statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute.").

Here, the heading of Article 13.01 suggests the article applies only to on-premises signs. But the operative text of Article 13.01 does not contain such a limitation. To the contrary, Article

---

[4] Reagan also argues the City is not entitled to summary judgment on this argument because the City "presented no argument either as to the applicability of [the unchallenged provisions] or to the validity of the grounds" the City relied upon in seeking summary judgment. Sur-Reply [#33] The Court rejects this argument. The argument put forward in the City's motion for summary judgment was sufficient to put Reagan on notice that the City disputed Reagan's standing to challenge the denials of its applications. *See* Am. Mot. Summ. J. [#24] at 17. Further, although the Court agrees the City might have better briefed its standing argument, this Court is nevertheless obligated to dismiss claims over which it lacks subject-matter jurisdiction. FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the Court must dismiss the action."). And despite its objections, Reagan has not been deprived of an opportunity to respond to the City's arguments. *See* Sur-Reply [#33] at 2–5.

[5] *See also id.* § 311.003 ("The rules provided in this chapter are not exclusive but are meant to describe and clarify common situations in order to guide the preparation and construction of codes.").

13.01 contains a number of provisions that appear to be of general applicability and do not depend on a distinction between on- and off-premises signs. For example, § 13.01.004 establishes that "[i]t shall be unlawful for any person to erect, construct, enlarge, move or convert *any sign* within the city . . . without first obtaining a sign permit . . . ." Sign Code § 13.01.004(a) (emphasis added). As another example, Sign Code § 13.01.019, entitled "Repairs and Maintenance," provides that "*all* signs in the city must be properly maintained at all times" and then sets out extensive procedural requirements for reporting and removing signs in violation of the Sign Code. *Id.* § 13.01.019 (emphasis added). And as a third example, Sign Code § 13.01.007(i) regulates the structural integrity of "[a]ny sign as defined in this article." None of these provisions contain textual limitations restricting their application to on-premises signs. *See* Sign Code § 13.01.002 (defining "sign" as "[a]ny surface, display, design, or device visible from a public right-of-way on which letters, illustrations, designs, figures, or symbols are painted, printed, [or] stamped . . . ."); *cf.* Sign Code § 13.01.002 (establishing distinct definitions for "signs," "on-premises signs," and "off-premises signs").

If Article 13.01 only applied to on-premises signs, then the provisions highlighted above—and many other provisions contained within Article 13.01 that appear to be of general applicability[6]—would not apply to off-premises signs. This would leave off-premises signs relatively unregulated, since Article 13.03—which does regulate off-premises signage—does not establish a comprehensive scheme for regulating off-premises signs.[7] *See* Sign Code § 13.03.001–.011. Yet it is unlikely the City intended to closely regulate on-premises signs while leaving off-premises signs comparatively unregulated, especially given the disfavored status of

---

[6] *See, e.g.,* Sign Code § 13.01.007 (setting forth "General Provisions").

[7] Indeed, Article 13.03 is five pages long, while Article 13.03 is twenty-five pages long. *See* Sign Code at 1–29.

off-premises signs within the City's regulatory scheme. More plausibly, in the Court's view, the City intended Article 13.01 to regulate both on- and off-premises signs and intended Article 13.03 to supplement Article 13.01 with specific regulations addressing only off-premises signs. The Court thus concludes Article 13.01 applies to both on- and off-premises signs.

Because the Court concludes Article 13.01 applies to both on- and off-premises signs, the application of the Pylon Provision—which is located in Article 13.01—does not turn on the challenged distinction between on- and off-premises signs. *See* Sign Code § 13.01.006(e) ("No pylon signs shall be permitted . . . ."). As a result, the Pylon Provision will remain unaffected if the Court invalidates the Sign Code's distinction between on- and off-premises signs, and Reagan's New Sign Applications will still be denied for failure to comply with the Pylon Provision. The Court therefore concludes Reagan has not demonstrated redressability because it has not shown the denial of the New Sign Applications will be affected by the Court's ruling in this case. *See KH Outdoor, LLC v. Clay Cty.*, 482 F.3d 1299, 1303–04 (11th Cir. 2007) ("Any injury [plaintiff] actually suffered . . . is not redressible [sic] because the applications failed to meet the requirements of other statutes and regulations not challenged."); *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 895 (9th Cir. 2007) (concluding plaintiff lacked standing to challenge sign-permitting process because plaintiff's permit applications were "denied on grounds that are constitutionally valid"). Consequently, Reagan lacks standing to challenge the denial of its New Sign Applications.

### 2.    Digital Conversion Applications

The City also suggests Reagan lacks standing to challenge the denial of the Digital Conversion Applications because Reagan cannot show redressability as to those applications, either. Reply [#30] at 1–2. Specifically, the City contends the Digital Conversion Applications

will be denied regardless of how the Court rules in this lawsuit because the applications propose sign modifications that would violate two Sign Code provisions—§ 13.01.006(g) and § 13.03.006(d)—that are not dependent on the challenged distinction between on- and off-premises signage. *Id.*

The Court concludes Reagan possesses standing to challenge the denial of the Digital Conversion Applications. Notwithstanding the City's argument to the contrary, § 13.01.006(g) and § 13.03.006(d) are dependent on the challenged distinction between on- and off-premises signs.[8] Section 13.01.006(g) prohibits "electronically controlled changeable copy signs . . . "except as specifically allowed by section[] 13.01.007." In turn, § 13.01.007(i) allows such signs subject to certain restrictions, including that such signs "shall not advertise goods or services not offered on the premises on which the sign is located." Thus, the approval of electronically controlled changeable signs under § 13.01.006(g) and § 13.01.007(i) turns, in part, on whether such signs qualify as on- or off-premises signs. Similarly, and somewhat redundantly, § 13.03.006(d)(4)—which applies only to off-premises signs[9]—emphasizes that "[n]o light emitting diode (LED) displays or signs shall be permitted."

If the Court holds the distinction between on- and off-premises signs is unconstitutional, then § 13.03.006(g) and § 13.03.006(d)(4) can no longer be relied upon as a basis for denying the Digital Conversion Applications. Absent any further argument from the City as to why or how the Digital Conversion Applications might still be denied for reasons independent of these provisions, the Court concludes that Reagan has standing to challenge the denial of these

---

[8] The City's denial letters also cite several other provisions as a basis for denying the Digital Conversion Applications, but the denial letters do not explain how or why those provisions applied and the City has not elaborated as to how those provisions might serve as a proper basis for denial here. *See* Denial Letters at 1–6; Reply [#30] at 1–2.

[9] *See supra* Section I.B.1 (concluding Article 13.03 applies only to off-premises signs).

applications because their denial would be redressed by an order invalidating the application of the challenged provisions to off-premises signs.

In sum, the Court concludes Reagan has standing to challenge the denial of the Digital Conversion Applications but not the New Sign Applications. Because Reagan has standing to challenge the denial of the Digital Conversion Applications, the Court proceeds to consider Reagan's claim that the denial of those applications violated the First Amendment.

## II.     First Amendment Claims

### A.     Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at

586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

**B.     Application**

The City argues it is entitled to summary judgment because the distinction drawn by the Sign Code between on-premises and off-premises speech is constitutional as a matter of law. Am. Mot. Summ. J. [#24] at 2. Reagan, meanwhile, contends this distinction is an unconstitutional content-based regulation of speech under the First Amendment. Resp. [#29] at 20.

### 1.    Standard of Scrutiny

As a predicate matter, the Court must determine what standards of scrutiny to apply in assessing the constitutionality of the Sign Code. The City argues regulation of commercial billboard speech is subject to intermediate scrutiny under the Supreme Court's decision in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). Am. Mot. Summ. J. [#24] at 6–7. Reagan disagrees. According to Reagan, the Supreme Court's decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) effectively abrogated *Metromedia* by requiring strict scrutiny be applied to all content-based regulations of speech, regardless of whether the speech in question is commercial or not. Resp. [#29] at 6–15. Reagan alternatively contends that even if intermediate scrutiny applies to commercial speech, strict scrutiny should be applied here because the Sign Code's content-based distinctions also apply to noncommercial speech. *Id.* at 15–16.

In *Metromedia*, the Supreme Court considered the constitutionality of a San Diego ordinance that permitted on-premises commercial advertising but forbid off-premises commercial advertising. *Metromedia*, 453 U.S. at 495–96. The Supreme Court "unambiguously held" San Diego could constitutionally discriminate between on-premises and off-premises commercial speech. *RTM Media, LLC v. City of Houston*, 584 F.3d 220, 223–224 (5th Cir. 2009) (citing *Metromedia*, 453 U.S. at 507–512). And in upholding the ordinance as applied to commercial speech, the Supreme Court applied a form of intermediate scrutiny—the *Central Hudson* commercial speech test—on the ground that commercial speech is entitled to "'lesser protection . . . than other constitutionally guaranteed expression.'" *Metromedia*, 453 U.S. at 507 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562–63 (1980)); *see also Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 583 (2011) (Breyer, J., dissenting) (characterizing *Central Hudson*'s commercial speech test as an "'intermediate'

11

standard"). Thus, under *Metromedia*, Reagan's commercial speech would be subjected to intermediate scrutiny.

Reagan contends, however, that the Supreme Court's more recent decision in *Reed* overrules both *Metromedia* and *Central Hudson* and requires strict scrutiny be applied to content-based regulations of even commercial speech. Resp. [#29] at 6–15. In *Reed*, the Supreme Court considered the constitutionality of a local ordinance that applied differing requirements to certain noncommercial signs depending upon whether the sign in question qualified as an "Ideological," "Political," or "Temporary Directional" sign under the ordinance. *Reed*, 135 S. Ct. at 2224–25. The Court held these sign classifications were content-based regulations of speech. *Id*. at 2228. The Court also held that because the regulations were content based, they were subject to strict scrutiny "regardless of the government's benign motive, content-neutral justification, or 'lack of animus toward the ideas contained' in the regulated speech. *Id*. (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). According to Reagan, *Reed* requires all content-based regulations of speech to survive strict scrutiny—regardless of whether the speech at issue is commercial or not. Resp. [#29] at 6–15.

*Reed* does not require the application of strict scrutiny to content-based regulations of commercial speech. For starters, *Reed* concerned noncommercial speech, rather than commercial speech, and perhaps for that reason, the majority opinion in *Reed* makes no mention of the *Central Hudson* commercial speech standard. *See Reed*, 135 S. Ct. at 2224. What's more, there's little reason to believe the Court in *Reed* intended to alter *sub silentio* the application of the *Central Hudson* standard to commercial speech. To the contrary, a majority of the justices involved in *Reed* have indicated that *Reed* did not affect the application of *Central Hudson* to content-based regulations of commercial speech. *See Reed*, 135 S. Ct. at 2234–35 (Breyer, J.,

concurring) (assuming content-based regulations of commercial speech are not subject to strict scrutiny after *Reed*); *Matal v. Tam.*, 137 S. Ct. 1744, 1767 (2017) (Kennedy J., concurring in part and concurring in the judgment) ("Unlike content based discrimination, discrimination based on viewpoint, including a regulation that targets speech for its offensiveness, remains a serious concern in the commercial context."). The Sign Code's regulation of commercial speech must therefore be evaluated under intermediate scrutiny.[10]

The Sign Code also regulates noncommercial speech, however. As Reagan correctly observes, content-based regulations of noncommercial speech are subject to strict scrutiny. *See Reed*, 135 S. Ct. at 2231. Further, the restrictions the Sign Code imposes on off-premises speech qualify as content-based restrictions under *Reed* because the restrictions depend upon the content of the sign. *See id.* at 2227 (majority opinion) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *see also id.* at 2237 (Kagan, J., concurring in the judgment) ("Given the Court's analysis, many sign ordinances [regulating signs based on their subject matter] are now in jeopardy, . . . [and] in trying to limit today's decision, Justice Alito's concurrence highlights its far-reaching effects.").[11] Finally, Reagan possesses standing to challenge the Sign Code's regulation of noncommercial speech because Reagan's billboards occasionally feature such

---

[10] *See also Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016) ("[A]lthough laws that restrict only commercial speech are content based, such restrictions need only withstand intermediate scrutiny." (internal citation omitted)).

[11] To illustrate, suppose a sign is erected in front of a store. If the content of that sign refers to goods sold on the premises, it is not subject to the restrictions. But if the content of the sign refers to goods sold off the premises, then that sign would be subject to the restrictions. The only difference between these two scenarios is the content of the sign.

speech. *See* Mot. New Trial [#39-2] Ex. A-1 at 1.[12] The Sign Code's content-based regulation of noncommercial speech must therefore be evaluated under strict scrutiny.

### 2. Constitutionality

The Court first assesses whether the Sign Code constitutionally regulates commercial speech. It then considers whether the Sign Code constitutionally regulates noncommercial speech.

### a. Commercial Speech

The First Amendment protects commercial speech only insofar as that speech concerns lawful activity and is not misleading. *Metromedia*, 453 U.S. at 507 (citing *Central Hudson*, 447 U.S. at 563–66). To pass muster under *Central Hudson*, government regulation of commercial speech falling within the ambit of the First Amendment must directly advance a substantial government interest while reaching no further than necessary to accomplish its goals. *Id*. Reagan argues (1) the City does not possess a substantial government interest; and (2) to the extent a substantial government interest exists, it is not directly advanced by the City's Sign Code. Resp. [#29] at 16.

Reagan first argues the City does not possess a substantial government interest. *Id*. The Court disagrees. The Sign Code purports to further the City's interests in traffic safety and aesthetics by reducing "confusion and hazards that result from excessive and prolific use of sign displays" and by limiting "visual clutter" that might lead to a "decline in the community's appearance." Sign Code §§ 13.01.001, 13.03.005. Under *Metromedia*, these stated interests in traffic safety and aesthetics qualify as substantial government interests. *Metromedia*, 490 U.S. at

---

[12] A previous version of this order erroneously concluded that Reagan lacked standing to challenge the Sign Code's regulation of noncommercial speech. Order of Sept. 24, 2018 [#37] at 5–9. Reagan subsequently moved for a new trial on the ground the Court had raised the issue of standing sua sponte and deprived Reagan a chance to respond. Mot. New Trial [#39]. The Court granted Reagan's motion after Reagan submitted evidence establishing standing to challenge the Sign Code's regulation of noncommercial speech. Order of Nov. 15, 2018 [#42].

507–08 ("Nor can there be substantial doubt that . . . traffic safety and the appearance of the city . . . are substantial governmental goals.").

Reagan next argues that the City's interests in traffic safety and aesthetics are not directly advanced by the City's Sign Code. Resp. [#29] at 16. Specifically, Reagan contends the Sign Code as a whole fails to advance any substantial government interest because the City allows a single tenant on one of its properties to use an LED display for off-premises advertising. Resp. [#29] at 3, 16–21 (noting the HEB Center—a sports arena and live-event venue—uses an LED sign to display off-premises advertising).[13] Yet this single exception "is not so pervasive as to seriously undermine the stated purpose[s]" of the City's Sign Code. *See Paradigm Media Grp. v. City of Irving*, 65 F. App'x 509, 2003 WL 1922999, at *3 (5th Cir. 2003) (per curiam) (upholding advertising ordinance with narrow exception for "sports facilities" on the ground the ordinance was not so riddled with exceptions as to undermine the ordinance's stated purpose). Absent any further argument from Reagan, the Court concludes the Sign Code directly and materially advances the City's stated interests in traffic and aesthetics by restricting the number and types of signs appearing within the City. *See Metromedia*, 490 U.S. at 509 ("We likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers . . . that billboards are real and substantial hazards to traffic safety."); *id.* at 510 (upholding ordinance restricting proliferation of billboards on the ground such restrictions advance substantial government interest in aesthetics).

---

[13] Reagan provides no cogent explanation as to why it believes "[t]he exception made for this sign renders" the entire Sign Code unconstitutional. *See* Resp. [#29] at 19–20. Indeed, the Sign Code contains many provisions which have little to do with the distinction between on-premises and off-premises advertising. *See, e.g.,* Sign Code § 13.01.006(a) (prohibiting use of "flashing lights" and "revolving beacon lights"); *id.* § 13.01.008 (regulating signage in residential subdivisions); *id.* § 13.01.017(a)(1) (prohibiting signs which obstruct fire escapes).

In sum, the Court concludes the Sign Code's regulation of commercial speech directly advances the City's substantial government interests in traffic safety and aesthetics and survives constitutional scrutiny under *Central Hudson*.

### b.      Noncommercial Speech

Laws that impose content-based restrictions on noncommercial speech must survive strict scrutiny, "which requires the [g]overnment to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231 (internal quotation marks and citation omitted).

The Court concludes the City is not entitled to summary judgment as to the constitutionality of the Sign Code's regulation of on- and off-premises noncommercial speech. As the Court previously noted, the Sign Code contains several restrictions which apply to off-premises speech but not on-premises speech. *See supra* Section I.B.2. What's more, these restrictions are content-based restrictions, and because they are content-based, they must survive strict scrutiny. *See supra* Section I.B.2. Thus, the burden is on the City to demonstrate the restrictions further a compelling interest and are narrowly tailored to achieve that interest. The City has not met this burden here—indeed, the City has not even attempted to argue the restrictions further a compelling interest or are narrowly tailored. *Cf.* Am. Mot. Summ. J. [#24] at 10. The Court therefore denies summary judgment on Reagan's claim that the Sign Code imposes unconstitutional, content-based restrictions on noncommercial, off-premises speech.

### Conclusion

The Court dismisses Reagan's claim that denial of the New Sign Applications violated the First Amendment on the ground that Reagan lacks standing to assert that claim. By contrast, the Court concludes Reagan does have standing to challenge the denial of the Digital Conversion

Applications. Because the Court concludes the denial of the Digital Sign Permits must be evaluated under strict scrutiny and because the City has not carried its burden under that standard, the Court denies summary judgment as to Reagan's claim that denial of the Digital Conversion Permits violates the First Amendment.

Accordingly,

IT IS ORDERED that the City's Amended Motion for Summary Judgment [#24] is GRANTED IN PART and DENIED IN PART as described in this opinion; and

IT IS FURTHER ORDERED that the City's claim that denial of the New Sign Applications violated the First Amendment is DISMISSED for lack of standing.

SIGNED this the 23rd day of May 2019.

SAM SPARKS
SENIOR UNITED STATES DISTRICT JUDGE