# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 6, 2021
Lyle W. Cayce
Clerk

No. 20-50125

REAGAN NATIONAL ADVERTISING OF AUSTIN, INCORPORATED,

*Plaintiff—Appellant*,

*versus*

CITY OF CEDAR PARK,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-717

Before JONES, COSTA, and DUNCAN, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:*

  Stripped to essentials, the issues here are whether Reagan National Advertising may, consistent with the Sign Code of Cedar Park, Texas, (1) install two new "off-premises" LED-equipped signs and (2) "replace" or "change" three existing "off-premises" signs to incorporate LED displays. We are of course bound by this court's decision in *Reagan Nat'l Advert. of*

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

*Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020), *cert. granted*, No. 20-1029, 2021 WL 2637836 (June 28, 2021). Thus, if Cedar Park's Sign Code discriminates between "on" and "off" premises content and permits new construction for only "on-premises" signs, then prohibiting Reagan's new signs based on this distinction violates the First Amendment. Whether or not this is the case, however, the Code, properly interpreted, prevents construction of new "pylon signs" regardless of the on/off-premises distinction. In addition, Reagan's LED conversion applications to modify existing "off premises" signs constitute "replacements" governed by both the on- and off-premises provisions. Reagan lacks standing to challenge the rejection of all five of its applications because its signs are not treated differently on the basis of their content. For these reasons, the judgment of the district court is AFFIRMED.

## I. BACKGROUND

Cedar Park is an incorporated municipality located to the northwest of Austin, Texas. The City regulates outdoor advertising signs through a series of provisions contained in Chapter 13 of the City Code of Ordinances (the "Sign Code"). Specifically, two articles of Chapter 13 apply here: Article 13.01 ("On-premises sign standards and permits") and Article 13.03 ("Off-premises sign standards and permits"). These articles are consistent in some respects but different in others.

Both Articles begin with identical statements of "[p]urpose and goals," which include: "(1) Promot[ing] a positive image of the city; (2) [p]rotect[ing] an important aspect to the economic base; and (3) [r]educ[ing] the confusion and hazards that result from excessive and prolific use of sign displays." § 13.01.001; § 13.03.001. Both Articles provide that "[a]ll land within the city and its extraterritorial jurisdiction (ETJ) is subject to compliance with this article." § 13.01.003; § 13.03.003.

No. 20-50125

Further, both Articles consistently define numerous relevant terms. Both Articles 13.01.002 and 13.03.002 define an "off-premises sign" as "[a] sign referring to goods, products or services provided at a location other than that which the sign occupies." § 13.01.002; § 13.03.002. Both Articles define a "nonconforming sign," i.e. whether "on premises" or "off premises," as one "that was lawfully installed at its current location but that does not comply with this article." § 13.01.002; § 13.03.002. And Article 13.01 defines a "Billboard" as "[a] sign defined and regulated by section 13.03.002 of this code." § 13.01.002. In turn, Article 13.03 defines a "Billboard" as "[a] sign located on private property advertising goods or services not made, sold, used or served on the premises upon which the sign is located." § 13.03.002.

But there are also critical differences, principally because Article 13.01 allows the construction of new "on premises" signs for which permits are obtained. Despite this, the Article prohibits pylon signs (defined as "[f]reestanding signs that are supported by a structure . . . attached to the ground by a . . . footing, with a clearance between the ground and the sign face"), and it limits signs with LED displays. § 13.01.002, § 13.01.006(e), (g). Section 13.01.007(i) further provides that LED displays "shall not advertise goods or services not offered on the premises on which the sign is located." Finally, § 13.01.016 states that nonconforming signs "shall be allowed to be continued and maintained at [their] existing location . . . but no change or alternation [sic] shall be made that would increase the degree of nonconformity." § 13.01.016(a). As well, "[n]onconforming, freestanding,

3

[and] on-premises signs may be replaced by new nonconforming monument or berm signs [subject to a list of limitations and obtaining a permit]." *Id.*[1]

In contrast, Article 13.03 provides that "[n]o existing off-premises sign shall be repaired or structurally modified in any manner without first obtaining a sign permit." *Compare* § 13.03.005 *with* § 13.01.004. Article 13.03 then prohibits all billboards and all other off-premises signs except as specifically authorized.[2] § 13.03.006. It further prohibits all LED signs. § 13.03.006(d). However, § 13.03.007 allows a "nonconforming sign . . . to be continued and maintained at its existing location." "The face of the sign may be changed . . . but no change or alternation [sic] shall be made that would increase the degree of nonconformity.," *id.*, and "[a]ny action that enlarges or reconfigures the existing sign in any dimension shall be considered an increase to a sign's degree of nonconformity." *Id.* Finally, § 13.03.007 states that "[a] nonconforming sign shall not be replaced, moved or altered beyond the scope of maintenance work permitted under subsection (a) above and section 13.03.016 [13.01.016]." *Id.* (second alteration in original). In its terms, this provision incorporates the replacement language of the on-premises sign Article's § 13.01.016, quoted above.

The City adopted the majority of these provisions in 2008 and amended the Sign Code in early 2017. The changes were set to take effect on March 9, 2017.

---

[1] One limitation requires a reduction in nonconformity. The provision details three means for doing so: (1) replacing a pylon sign with a monument or berm sign; (2) reducing the height of the sign structure; or (3) reducing the sign area. § 13.01.016.

[2] Although Article 13.03 does not specifically authorize any other off-premises signs, this structure seems to contemplate that the City could create a category of permissible off-premises signs. But at the time of this suit, no such category existed.

A day before the amendments' effective date, Reagan applied to the City for five permits for outdoor advertising signs.[3] Two of these applications were for new signs while the other three sought to convert existing signs from traditional vinyl to LED displays. The City denied all five applications as proscribed by § 13.03.006(a)—the provision prohibiting billboards and "off premises" signs. The following day, the City responded with updated letters, which recited additional reasons for denying the applications. Specifically, the LED conversion applications were denied because they violated: (1) § 13.03.006 (the billboard prohibition); (2) § 13.03.007(a) and § 13.01.016(a) (the nonconforming sign requirements); (3) § 13.01.006(g) and § 13.01.007(i)(4) (the prohibition on off-premises LED advertising); and (4) § 13.03.006(d) (no LED displays). Further, the new sign applications were denied because they violated: (1) § 13.03.006 (the billboard prohibition); (2) § 13.01.006(e) (no pylon signs); (3) § 13.01.006(g) and § 13.01.007(i)(4) (the prohibition on off-premises LED advertising); and (4) § 13.03.006(d) (no LED displays).

Counsel for Reagan requested that the City reconsider its decision, explaining that the provisions cited by the City utilized impermissible content-based distinctions and were susceptible to legal challenge, citing the Supreme Court's decision in *Reed v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct.

---

[3] It appears that amended code did, in fact, take effect on March 9, 2017. *See* CITY OF CEDAR PARK, CHAPTER 13 SIGN REGULATIONS (March 9, 2017), https://www.cedarparktexas.gov/home/showdocument?id=7125. Though neither party argues it, this could present a mootness issue—a threshold jurisdictional question. Texas law, however, requires permit applications to be evaluated under the law in effect at the time of filing. TEX. LOC. GOV'T CODE § 245.002. This court determined that this provision precluded finding an analogous case moot. *See City of Austin*, 972 F.3d at 701 (concluding that an amendment to the city sign code in August 2017 did not moot a challenge to the code in effect when the applications were filed in April and June of 2017). Thus, the rule of orderliness resolves this jurisdictional issue.

2218 (2015). On May 1, the City responded, characterizing Reagan's legal argument as "ambitious, to say the least." The City maintained that the content distinctions drawn by the Sign Code were constitutionally permissible, and the other provisions cited still provided ample, content-neutral grounds to deny the applications. The City refused Reagan's request to reconsider those applications.

On June 14, 2017, Reagan filed suit in state court claiming that the City's Sign Code violated the First Amendment by impermissibly utilizing content-based distinctions. The City removed the case to federal court, whereupon a series of decisions by the district court ensued as it threaded its way through the issues. Ultimately, the court determined that as to the new sign applications, both Articles 13.01 and 13.03 govern off-premises signs, and thus the "no pylon signs" provision provided a content-free distinction justifying their denial. Even if Reagan prevailed on its First Amendment claims, the City could still validly deny the permit. Reagan lacked standing to sue because its constitutional claim was not redressable.

As to the LED conversion applications, following a bench trial, the court adopted the City's primary argument that § 13.01.016(a), concerning nonconforming on-premises signs, provided a content-neutral reason to deny those applications. Specifically, the LED conversions constituted a "replacement" of the pre-existing off-premises signs and, to be permissible, needed to reduce the degree of nonconformity. The court agreed with the City that § 13.01.016(a) was applicable because § 13.03.007(e), the provision relating to nonconforming off-premises signs, incorporated § 13.01.016(a).

Accordingly, the court saw the critical question as whether Reagan was seeking to "replace" the existing nonconforming sign or merely "change" it. If it was the former, then the replacement must adhere to the requirements in § 13.01.016(a), and it was undisputed that Reagan's signs

failed to meet the height and size limitations. The district court construed "replace" according to its plain meaning, determined that Reagan's applications denoted "replacing" the signs, and ruled that Reagan lacked standing because the City could have validly denied the applications on content-neutral grounds. Reagan timely appealed.

## II. STANDARD OF REVIEW

This court reviews *de novo* a district court's grant of summary judgment. *Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.*, 920 F.3d 243, 247 (5th Cir. 2019). After a bench trial, a district court's finding of fact "are reviewed for clear error and its legal conclusions *de novo*." *Id.* Questions of statutory interpretation are reviewed *de novo*, *Garcia v. City of Laredo*, 702 F.3d 788, 791 (5th Cir. 2012), as is Article III standing, *Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

## III. DISCUSSION

Whether Reagan has standing to assert a First Amendment challenge to the denial of its five new sign and LED conversion application depends on whether "(1) [it] suffered an injury in fact, which is a concrete and particularized invasion of a legally protected interest; (2) the injury is traceable to the challenged action of the [City]; and (3) it is likely, rather than merely speculative, the injury will be redressed by a favorable decision." *Hollis v. Lynch*, 827 F.3d 436, 441 (5th Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992)). In this context, other courts have uniformly held that redressability is lacking when other *unchallenged* local regulatory provisions provide alternative legitimate grounds to deny the relief sought.[4]

---

[4] *See Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 893 (9th Cir. 2007); *Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456, 461–63 (6th Cir. 2007); *KH*

Reagan challenges only Cedar Park's alleged content-based distinction between on-premises and off-premises signs. Reagan's general argument is that Articles 13.01 and 13.03 separately regulate, respectively, on- and off-premises signs, as their formal titles in the City Code of Ordinances indicate. Because the regulatory regimes favor the former over the latter types of signs, and because the distinction between them can only be discerned by reading the contents of the signs themselves, the Sign Code's attempted distinction violates the First Amendment as interpreted in this court's *City of Austin* decision.

We agree, contrary to the district court's conclusion, that the Articles cover different types of signs depending on whether they are on- or off-premises. But as will be seen, in critical respects, the Articles are either harmonious or provide independently valid reasons for the City's denial of the applications.

When interpreting a Texas statute or municipal ordinance, the court starts with the text of the legislation. *BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 20 (Tex. 2016). "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). Only if the statute is ambiguous, may the court "resort to rules of construction or extrinsic aids to construe the language." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008). This restriction includes extratextual factors such as the title.

---

*Outdoor, L.L.C. v. Clay Cty.*, 482 F.3d 1299, 1303 (11th Cir. 2007); *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 430 (4th Cir. 2007); *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006); *Harp Advert. Illinois, Inc. v. Vill. of Chicago Ridge*, 9 F.3d 1290, 1291–93 (7th Cir. 1993); *see also Coastal Outdoor Advert. Grp., LLC v. Twp. of E. Hanover*, 397 F. App'x 794, 795–96 (3d Cir. 2010) (unpublished).

*Chase v. State*, 448 S.W.3d 6, 11 (Tex. Crim. App. 2014); *accord Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 809 (Tex. 2010) (noting that when the plain meaning is clear, "the title of the section carries no weight, as a heading 'does not limit or expand the meaning of a statute'" (quoting TEX. GOV'T CODE § 311.024)). But in considering the plain meaning, the court "must do so while looking to the statute as a whole, rather than as 'isolated provisions.'" *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (quoting *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). The statute must be read "contextually, giving effect to every word, clause, and sentence." *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013).

The City asks us to determine that certain provisions in Article 13.01, like the "no pylon signs" provision, apply to off-premises signs, not just to "on-premises" signs as the title of Article 13.01 might indicate. And both parties spar over canons of statutory construction, extratextual evidence and the deference due to the municipality's interpretation of its own ordinances. Generally, we are persuaded that these Articles intend to treat separately the on- and off-premises signs for reasons well beyond their specific titles. As has been shown, numerous provisions in each Article are repeated verbatim in the other. Moreover, the two Articles are quite particular in overlapping or dealing separately with the subject matter they purport to cover. Additional provisions in the on-premises sign regulations expound at length on the types of signs based on their content, and the different modes of construction, lighting, location etc. afforded various types. None of those specifics exist or are referenced in the off-premises sign Article because by definition, they are inapposite. Thus, based on the text of these Articles, a facile application of provisions in the on-premises sign Article to that governing off-premises signs is incorrect.

Nonetheless, the Articles have to be read in tandem as they are written. Article 13.01 expressly applies to "[a]ll *land* within the city," but

fails to state that it applies to *all signs* within the city. § 13.01.003. Article 13.01, moreover, defines a "Billboard" as a "sign defined and regulated by section 13.03.002." And § 13.03.002 defines a "Billboard" as "[a] sign located on private property advertising goods or services not made, sold, used or served on the premises upon which the sign is located." This express cross-reference to the off-premises sign Article demonstrates that—at least with respect to "billboards"—Article 13.03 supplants Article 13.01. There is no dispute that all of Reagan's proposed signs and replacement LED signs meet the statutory definition of a "billboard." They are (or will be) located on private property and will primarily advertise goods and services located or provided elsewhere.[5] *See* § 13.03.002. This ends part of the inquiry. Billboards are regulated by Article 13.03, not 13.01. Accordingly, the district court erred in applying those provisions to Reagan's applications. We apply the correct reading of the ordinances to each type of sign application filed by Reagan.

**A. New Sign Applications**

The City cites two provisions under Article 13.03 to deny Reagan's new sign applications:[6] § 13.03.006(a) (no billboards) and § 13.03.006(d) (no LED signs). Neither provision is content-neutral when juxtaposed against

---

[5] Reagan put forth evidence that 75-80% of its speech is commercial advertising.

[6] For the first time on appeal, the City asserts an additional reason to deny the applications—arguing that Reagan's applications expired on September 4, 2017 which now provides another content-neutral basis for denying the applications. Yet, "[s]tanding is determined [at] the time th[e] suit is filed." *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 n.3 (5th Cir. 2005). When Reagan filed suit on June 14, 2017, the applications were not expired so the City could not then rely on that reason to deny them. "Unlike standing analysis, mootness accounts for such events that occur during the litigation." *Pool v. City of Houston*, 978 F.3d 307, 313 (5th Cir. 2020). This case is not moot because there remain two adverse parties with cognizable legal interest in the outcome of the litigation. *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008).

the regulation of on-premises signs. Section 13.03.006(a), in prohibiting billboards and off-premises signs, falls directly in the way of the distinction prohibited by *City of Austin*. And on its face, § 13.03.006(d) prohibits LED signs, which could provide a content neutral ground for the City's denial of sign permits. But because § 13.01.007(i) allows LED signs when erected "on-premises," the off-premises ban implemented by § 13.03.006(d) can only serve as a reason for denying the application after the City makes a content-based determination. Under these two provisions, the City lacks a content-neutral ground to deny the applications. Reagan would have standing to challenge the content-based distinction concerning the new sign applications if those are the only possible grounds for denying the applications. Reagan's First Amendment claim would be redressable.

Since those provisions aren't the only relevant ones, however, the quest for standing fails. Section 13.01.006(e) prohibits on-premises "pylon signs." Reagan does not contest that its proposed new signs would qualify as "pylon signs" under § 13.01.002[7] nor does it contest the validity of the "pylon sign" prohibition. As has been noted above, § 13.03.006(a) bans billboards and all "other off-premises signs," and this catch-all clause necessarily includes off-premises pylon signs. Thus, the type of new sign that Reagan wishes to erect would be barred by either the on-premises or off-premises sign regulations. Consequently, there is no content-based discrimination; Reagan's proposed new signs are prohibited by both Articles based on their physical characteristics. The company's claim based on the First Amendment fails for lack of satisfying the causal nexus and redressability prongs of standing.

---

[7] The definitions of "billboard" and "pylon sign" are not mutually exclusive. Though Reagan's signs qualify as billboards, and are solely regulated by Article 13.03, their physical description also falls within the Sign Code's definition of a pylon sign.

## B. LED Conversion Applications

As to the LED conversion applications, the City's denial letter asserted, *inter alia*, § 13.03.006(a), § 13.03.006(d), and § 13.03.007(a) as Article 13.03 off-premises grounds for denial. We have just explained that § 13.03.006(a) and (d) both rely on content-specific determinations. This leaves only § 13.03.007, the provision on nonconforming signs. But rather than argue that § 13.03.007 expressly provides content-neutral grounds for denial,[8] the City contends that § 13.03.007(e) incorporates § 13.01.016, an on-premises provision that specifies content-neutral requirements pertaining to replacement signs.

To subscribe to the City's argument, it is necessary (1) to affirm under the clear error standard the district court's finding that the LED conversions entail "replacements" of nonconforming signs rather than "changes"; (2) to conclude that § 13.03.007(e) is not "more restrictive" than its (incorporated) Article 13.01 counterpart and therefore content-based in relevant parts; and (3) to determine that the City's arguably "pretextual" grounds for denying these applications do not control over a reasonable interpretation of the Sign Code. Reagan poses counter-arguments to each of these propositions, and we reject each in turn.

First, Reagan does not seriously challenge the district court's findings of fact that its current off-premises signs are "nonconforming" under Article 13.03 or that the proposed LED conversions would be replacements

---

[8] At first blush, § 13.03.007 does provide some facially neutral grounds to deny the application. For instance, that section prohibits any "change or alternation . . . that would increase the degree of nonconformity" such as "[a]ny action that enlarges or reconfigures the existing sign in any dimension." However, this provision is more restrictive than its counterpart, § 13.01.016(a) which omits the prohibition on dimensional changes. Because the City is forced to determine whether the sign application is on- or off-premises before denying it under § 13.03.007, it is content-based under *City of Austin*.

of the existing nonconforming signs. If alterations from the vinyl displays to LED capability represented mere "changes" under Article 13.03,[9] Reagan would have standing to sue because Article 13.01 permits LED conversions of on-premises signs.

Instead, Reagan moves to its second argument, which is that Article 13.03, properly construed, does not allow for "replacements" of nonconforming signs. The distinction between this Article and Article 13.01 is allegedly content-based because Article 13.01 does permit replacements under certain conditions. We disagree with Reagan's interpretation.

It is true that § 13.03.006(a) states that "[n]o billboards shall be permitted." The definitions in § 13.03.002, however, distinguish between "billboards" and "nonconforming signs," the latter of which are a logical subset of billboards that are specifically grandfathered subject to further regulations. Accordingly, § 13.03.007 explains the treatment of nonconforming signs. Reagan contends that this provision permits no "replacements" of nonconforming signs. On the contrary, § 13.03.007(e) states "[a] nonconforming sign shall not be *replaced, moved or altered beyond the scope of maintenance work . . . and section 13.03.016 [13.01.016]*" (emphasis added and second alteration in original). It is hard to discern any purpose for incorporating this Article 13.01 on-premises sign provision *other than* to authorize but set restrictions on *replacements*. That is the only purpose of § 13.01.016. Further, while there may be some tension between the incorporation of this provision and the language in § 13.03.007)(a) ("Any action that enlarges or reconfigures the existing sign in any dimension shall be considered an increase in the sign's degree of nonconformity"), it is the

---

[9] Section 13.03.007 allows "changes" to the face of nonconforming signs only if they "do not increase the degree of nonconformity." Reagan acknowledged that the vinyl displays would have to be removed for LED displays to be installed.

courts' duty to harmonize, not render superfluous, all the words in statutes.[10] We see no fatal conflict between these provisions. In any event, both provisions are violated by Reagan's proposed LED conversions; it is therefore unnecessary to speculate on potential conflicts based on hypothetical facts.

Based on the Sign Code's provisions, which are reconciled by a reasonable reading,[11] Reagan's LED conversions violate non-content based specifications in § 13.01.016, *inter alia*, by virtue of their excessive proposed height; the sign area exceeding the maximum allowable area by more than 15%; and no "reduction in nonconformity" by replacing a pylon sign with a monument sign or reducing the height or sign area. *See* § 13.01.016(a)(1)–(3). The applications would be subject to rejection under both the on- and off-premises regulations.

Regarding Reagan's third challenge, that this analysis of the City's Sign Code is a latecomer and pretextual, there is one response. As other authorities have noted,[12] the question for standing is not precisely what the City explained as its reasoning, but what the duly enacted regulations ordain and therefore what the City could rely on to justify its denials. The textually

---

[10] Reagan also contends that, taken as a whole, Article 13.03 regulates nonconforming signs, as to modifications and maintenance, far more stringently than Article 13.01. Whether that is so does not present issues relevant to the present dispute over granting permits to begin with.

[11] Our harmonization of the provisions also accords with the general principle that a city's reasonable interpretation of ambiguous statutes is to be upheld if it accords with the text. *See Zimmerman v. City of Austin*, 881 F.3d 378, 384 (5th Cir. 2018).

[12] *See Midwest Media*, 503 F.3d at 461–62 (6th Cir. 2007) (explaining that "even in the absence of these [challenged] regulations" the plaintiffs lacked standing "because the size and height restrictions still would preclude the township from approving their sign applications and thus still would preclude plaintiffs from erecting each of these signs").

expressed goals of the Sign Code should not be subordinated to bureaucratic missteps or misspeaking.

For all these reasons, Reagan's applications for LED conversions were denied under non-content-based regulations in the Sign Code, and the company lacks standing to challenge the Sign Code's content-specific provisions.

The district court's judgment is AFFIRMED.

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 6, 2021
Lyle W. Cayce
Clerk

No. 20-50125

REAGAN NATIONAL ADVERTISING OF AUSTIN, INCORPORATED,

*Plaintiff—Appellant*,

versus

CITY OF CEDAR PARK,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-717

_____

Before JONES, COSTA, and DUNCAN, *Circuit Judges*.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED.

IT IS FURTHER ORDERED that plaintiff-appellant pay to defendant-appellee the costs on appeal to be taxed by the Clerk of this Court.

Certified as a true copy and issued
as the mandate on Aug 30, 2021
Attest:
Clerk, U.S. Court of Appeals, Fifth Circuit

# United States Court of Appeals
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

August 30, 2021

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

    No. 20-50125    Reagan Natl Advtsng v. Cedar Park
                    USDC No. 1:17-CV-717

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        *Charles Whitney*

                        By: _____
                        Charles B. Whitney, Deputy Clerk
                        504-310-7679

cc:
    Mr. Bryan Russell Horton
    Mr. Clark Willis Richards
    Mr. Daniel R. Richards
    Mr. Daniel Riegel